# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 20-1937V

|  |  |
|---|---|
| DANIEL MILLER,<br><br>    Petitioner,<br><br>v.<br><br>SECRETARY OF HEALTH AND HUMAN SERVICES,<br><br>    Respondent. | Chief Special Master Corcoran<br><br>Filed: June 28, 2024 |

*Ronald Craig Homer*, Conway, Homer, P.C., Boston, MA, for Petitioner.

*Lauren Kells*, U.S. Department of Justice, Washington, DC, for Respondent.

### **RULING ON ENTITLEMENT**[1]

On December 21, 2020, Daniel Miller filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleged that he suffered a left shoulder injury related to vaccine administration ("SIRVA"), a defined Table Injury, after receiving influenza ("flu") vaccine on October 22, 2019.[3] Petition at 1, 1 ¶¶ 2, 13. On April 22, 2022, he filed an amended

---

[1] Because this Ruling contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Ruling will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

[3] Petitioner initially filed a cursory petition, without accompanying medical records, likely due to the potential removal of SIRVA from the Vaccine Injury Table. *See* National Vaccine Injury Compensation Program: Revisions to the Vaccine Injury Table, Proposed Rule, 85 Fed. Reg. 43794 (July 20, 2020) (proposed

petition, alleging that he "suffered the residual effects of his injury for more than six months after the administration of the flu vaccine." Amended Petition at ¶ 13.

The parties dispute whether the "severity requirement" (applicable to all Program claims) is met. For the reasons discussed below, I find that Petitioner likely suffered the residual effects of his SIRVA for more than six months, and he has satisfied the other requirements of a compensable Table SIRVA injury. Petitioner is thus entitled to compensation under the Vaccine Act.

## I. Relevant Procedural History

During the subsequent eleven-month period after filing the Petition, Mr. Miller filed the medical records required under the Vaccine Act. Exhibits 1-11, ECF Nos. 9, 14; *see* Section 11(c). A few months later, he filed a more legible copy of the handwritten entries in the medical records (filed as Exhibit 11), and a declaration[4] asserting the lack of any civil action. Exhibits 12-13, ECF Nos. 18, 21. On March 17, 2022, the case was activated and assigned to the "Special Processing Unit" (OSM's adjudicatory system for resolution of cases deemed likely to settle). ECF No. 25.

Approximately one month later, on April 22, 2022, in response to my order, Petitioner filed a more detailed declaration[5] and amended petition. Exhibit 14, ECF No. 29; Amended Petition, ECF No. 31. While awaiting HHS review of the claim, he filed updated medical records and conveyed a demand to Respondent. Exhibits 15-16, filed Nov. 18, 2022, ECF No. 36; Status Report, filed Apr. 3, 2023, ECF No. 42; Exhibits 17-20, filed Aug. 2, 2023, ECF No. 45.

On September 8, 2023, Respondent filed his Rule 4(c) Report opposing compensation. ECF No. 48. Emphasizing the gap in treatment from December 2019 to September 2020, which he characterized as extensive (*id.* at 7), Respondent argued that "Petitioner's claim does not meet the threshold severity requirement for all Vaccine Act claims . . . [and] respectfully requests that the petition for compensation be dismissed" (*id.* at 8). He specifically maintained that Petitioner's assertion that he did not seek

---

removal of SIRVA from the Vaccine Injury Table); National Vaccine Injury Compensation Program: Revisions to the Vaccine Injury Table, Delay of Effective Date, 86 Fed. Reg. 10835 (Feb. 23, 2021) (delaying the effective date of the final rule until April 23, 2021); National Vaccine Injury Compensation Program: Revisions to the Vaccine Injury Table, Withdrawal of Final Rule, 86 Fed. Reg. 21209 (Apr. 22, 2021) (rescinding the final rule).

[4] This declaration was signed under penalty of perjury as required by 28 U.S.C.A. § 1746. Exhibit 13.

[5] Like his earlier declaration, this declaration was signed under penalty of perjury as required by 28 U.S.C.A. § 1746. Exhibit 14.

treatment during this time due to the worldwide COVID Pandemic is "undercut by the fact that [Petitioner] did seek treatment for other conditions and failed to mention any left shoulder complaints." *Id.* at 7.

On December 4, 2023, reacting to Respondent's complaint that one record in Exhibit 8 was difficult to read (Rule 4(c) Report at 1 n.1), Petitioner filed a more legible copy of the record. Exhibit 21, ECF No. 50. The matter is now ripe for adjudication.

## II.     Finding of Fact Regarding Onset and Duration

At issue is whether Petitioner continued to suffer the residual effects of the SIRVA for more than six months. Section 11(c)(1)(D)(i) (statutory six-month severity requirement).

### A.     Authority

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove, by a preponderance of the evidence, the matters required in the petition by Vaccine Act Section 11(c)(1). A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. Section 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence.  The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Hum. Servs.*, No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, this rule does not always apply. "Written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." *Murphy v. Sec'y of Health & Hum. Servs.*, No. 90-882V, 1991 WL 74931, *4 (Fed. Cl. Spec. Mstr. April 25, 1991), quoted with approval in decision denying review, 23 Cl. Ct. 726, 733 (1991), *aff'd per curiam*, 968 F.2d 1226 (Fed.Cir.1992)). And the Federal Circuit recently "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021).

The United States Court of Federal Claims has outlined four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Hum. Servs.*, 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1335 (Fed. Cir. 2014).

The Court has also said that medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery v. Sec'y of Health & Hum. Servs.*, 42 Fed. Cl. 381, 391 (1998) (citing *Blutstein v. Sec'y of Health & Hum. Servs.*, No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998). The credibility of the individual offering such fact testimony must also be determined. *Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Hum. Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id.*

The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe*, 110 Fed. Cl. at 204 (citing Section 12(d)(3); Vaccine Rule 8); *see also Burns v. Sec'y of Health & Hum. Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

**B.     Analysis**

I make the severity finding after a complete review of the record to include all medical records, affidavits or declarations, and additional evidence filed. Specifically, I base the findings on the following evidence:

- Prior to vaccination, Petitioner suffered from common illnesses (URI[6] and sinusitis), sleep apnea, ADHD,[7] hypothyroidism, and heart palpitations. Exhibit 2; Exhibit 5; Exhibit 8 at 15-104.

- On October 22, 2019, Petitioner (47-years old) received the flu vaccine intramuscularly in his left deltoid at a Walgreens pharmacy. Exhibit 1 at 5-6.

- Approximately one month later, on November 20, 2019, Petitioner visited his primary care provider ("PCP"), complaining of left arm pain "after flu shot (Walgreens) 3 weeks ago." Exhibit 8 at 14. He recounted that the flu shot hurt a lot when it went in, that his arm was really sore, and his condition worsened thereafter. Noting a slight reduction in range of motion ("ROM"), the PCP prescribed prednisone. *Id.*

- Two days later, on November 22, 2019, Petitioner visited his cardiologist for follow-up appointment related to his history of palpitations, flutters, and premature ventricular contractions." Exhibit 5 at 18. In the record from that visit, it also was noted that he was exercising more, cycling with his family, and taking "prednisone for a frozen shoulder." *Id.* at 17.

- On November 27, 2019, Petitioner called his PCP, reporting that his left shoulder pain had returned after finishing his steroid medication. Exhibit 8 at 12. Although not as severe as prior to the medication, Petitioner expressed a fear that his pain was worsening. *Id.* Opining that Petitioner may need a steroid injection, the PCP referred Petitioner to an orthopedist. *Id.*

- On December 4, 2019, Petitioner was seen by a physician board certified in Physical and Rehabilitation and Sports Medicine ("sports medicine physician"), complaining of immediate pain with vaccination on October 22, 2019. Exhibit 4 at 13. Reporting that his pain had improved with the Medrol dosepak prescribed by his PCP, but returned to with a severity level of 80 percent what he previously experienced, Petitioner described pain more noticeable when reaching forward and overhead and aggravated while dressing. Observing pain with flexion and abduction, localized to the supraspinatus, the sports medicine physician diagnosed Petitioner with "[p]ost flu shot shoulder pain" and bursitis as seen on imaging. *Id.* Stating

---

[6] URI stands for upper respiratory infection. MEDICAL ABBREVIATIONS at 614 (16th ed. 2020).

[7] ADHD stands for attention-deficit hyperactivity disorder. MEDICAL ABBREVIATIONS at 38.

that Petitioner should consider a steroid injection, he prescribed a home exercise program ("HEP"). *Id.*

- On December 18, 2019, Petitioner left a voice message with the sports medicine physician, stating that he was improving, but wished to discuss his shoulder condition. Exhibit 4 at 12. In response, the physician left a voice message, stating that Petitioner should continue his HEP and consider physical therapy ("PT"). He added that the earlier examination revealed a possible small tear that "would need to be verified in a subsequent exam." *Id.*; *see id.* at 11 (results of December 4th ultrasound).

- On January 15, 2020, Petitioner returned to his PCP for a follow-up related to his hypothyroidism. Exhibit 12 at 2. There is no mention of left shoulder pain in this record. *Id.* at 2, 4.

- Approximately six months later, on July 9, 2020, Petitioner returned to his PCP for treatment of a possible COVID exposure. Exhibit 8 at 10; Exhibit 12 at 6. The medical record from this visit shows a full examination was performed, including his heart palpitations and thyroid and PSA[8] levels. Exhibit 8 at 6-10; Exhibit 12 at 6. There is no mention of left shoulder pain in this record. *Id.*

- Four days later, on July 11, 2020, Petitioner returned for his test results, including the COVID test which was negative. Exhibit 8 at 6 (other testing), 71 (COVID results). Again, there is no mention of left shoulder pain. *Id.*

- On August 22, 2020, Petitioner visited an urgent care facility after another recent COVID exposure from a co-worker. Exhibit 10 at 4-7. His test results were negative. *Id.* at 7.

- On September 25, 2020, Petitioner informed his sports medicine physician[9] that "[h]is left shoulder [wa]s much better but still bother[ed] him with exercise." Exhibit 4 at 10. He added that he could not tell if his HEP was helping. The physician prescribed PT and stated that he would repeat the imaging that showed a possible supraspinatus tear if Petitioner's symptoms had not improved within a month. *Id.*

---

[8] PSA stands for prostate-specific antigen. MEDICAL ABBREVIATIONS at 488.

[9] Although not clearly designated as such, it appears that this exchange was during a phone call, rather than an in-person visit. There is no notation of vitals being taken, and the physician later referred to this encounter as a telephone call. *See* Exhibit 16 at 10, 6 (respectively).

- On October 7, 2020, Petitioner presented for an initial PT evaluation, complaining of left shoulder pain "present for [approximately] one year with onset after flu shot." Exhibit 16 at 6; *accord id.* at 19-21. Reporting no current pain, he described pain ranging from zero to five out of ten, adding that it interfered with his ability to exercise. *Id.* at 6, 20-21. Observing a loss in both left shoulder and cervical rotation, the therapist assessed Petitioner as suffering from left shoulder adhesive capsulitis and "cervical mechanical dysfunction." *Id.* He recommended one to two PT sessions each week for six to eight, but noted that he expected Petitioner's progress to be slow. *Id.* at 6-7. Petitioner estimated that his pain level was one out of ten both prior to and after treatment received that day. *Id.* at 11.

- Throughout October and November 2020, Petitioner attended 10 PT sessions. Exhibit 16 at 4 at 34. He reported pain levels fluctuating between zero to four prior to treatment, and between zero to two thereafter. *Id.* at 10, 8, 16, 4, 12, 14, 28, 32, 30, 34 (in chronologic order).

- By his eleventh PT session on December 7, 2020, Petitioner's "cervical component [wa]s largely resolved, with recovery of cervical rotation." Exhibit 16 at 38. It was noted that his "[s]everity of shoulder pain [had] decreased overall, although symptom intensity continue[d] to vary and AROM/PROM remain[ed] limited." *Id.* The therapist recommended continued PT, one to two times weekly, for four to six weeks. *Id.*

- On December 11, 2020, Petitioner returned to the sports medicine physician, for "[o]ngoing problems since last seen in 12/2019." Exhibit 16 at 6. He reported that his pain was "variable and intermittent," occurred most often at night, was aggravated by reaching forward or up, and had improved with PT. Noting that he sent Petitioner to PT after talking to him by telephone in September 2020, the physician concluded that "his cervical spine [wa]s now moving normally" and his "[s]houlder may be moving better as well but he is limited by the inflammatory component by adhesive capsulitis." *Id.* Assessing Petitioner as "ha[ving] reached a plateau," the physician administered a steroid injection. *Id.* at 6-7.

- Petitioner attended an additional 10 PT sessions in December through early March 2021. Exhibit 16 at 40-75. At his 21st PT session on March 10, 2021, he reported "generally no pain at rest," but was determined to have reached a firm plateau. *Id.* at 75. The therapist encouraged Petitioner to return to his medical provider. *Id.*

7

- Seen by the sports medicine physician on March 19, 2021, Petitioner reported improvement after the steroid injection he received in December 2020. Exhibit 15 at 10. Observing some limitations in ROM with mild pain and agreeing Petitioner exhibited "[m]odest improvement in adhesive capsulitis since injection in December" (*id.*), the physician administered a second, ultrasound guided, steroid injection "targeting the subacromial bursa" and instructed Petitioner to resume PT. *Id.* at 11-12.

- At his 26th PT session on April 28, 2021, Petitioner was noted to be "making slow but definite improvement post-injection" and tolerating his HEP well. Exhibit 16 at 91.

- Petitioner attended six more PT sessions in May through July 2021, most occurring in June. Exhibit 16 at 92-111, 113-14.

- By his 33rd PT session on July 7, 2021, Petitioner reported feeling much better and being ready for self-management. Exhibit 16 at 110. On September 14, 2021, Petitioner's symptoms were described as "largely resolved" in July 2021, and he was discharged from PT. Exhibit 16 at 112, 115.

- In his declaration, signed on March 9, 2022, Petitioner asserted that he felt immediate pain upon vaccination and noticed that the site of administration was higher than usual. Exhibit 14 at ¶ 2. He maintained that he did not seek treatment in January 2020, because he was preparing for his son's bar mitzvah, and planned to seek treatment from the sports medicine physician thereafter. *Id.* at ¶ 7. Instead, he "felt [he] should try to continue managing on [his] own, rather than risk exposure, after the COVID Pandemic began. *Id.*

To satisfy the Vaccine Act's severity requirement in this case, Petitioner must show that he suffered symptoms of his alleged SIRVA beyond April 22, 2020 (assuming a vaccination-day onset, which the record preponderantly supports). The above medical entries preponderantly suggest Petitioner suffered from pain (although often mild and intermittent) and limited ROM through at least July 2021, despite a nine-month gap in treatment from mid-December 2019, until September 2020.

Most telling in this case is the fact that all medical providers viewed Petitioner's symptoms as part of the same left shoulder condition. The sports medicine physician

treating Petitioner in December 2019 through March 2021, attributed the left shoulder symptoms he complained of in September and December 2020, to the post-flu vaccine shoulder pain and bursitis he diagnosed in December 2020. *E.g.,* Exhibit 4 at 10; Exhibit 16 at 6. And the physical therapists who treated Petitioner accepted his medical history of pain onset with the flu vaccine administered in October 2019, without comment. *See* Exhibit 16.

Admittedly, there is a large treatment gap that begins prior to the expiration of the six-month severity period defined by the Act. But this gap coincided with the worldwide COVID-19 Pandemic,[10] which monopolized medical resources at that time. Although Respondent claims that Petitioner continued to receive treatment for other conditions, a review of the medical records reveal this assertion is only partially accurate. Other than an appointment in mid-January 2020 to monitor his thyroid condition, Petitioner's appointments (in July and August) were clearly prompted by COVID exposures specifically. Although other testing was performed during the July appointment, the need for a COVID test was clearly stated.

In addition, Petitioner's failure to mention his left shoulder condition when seen by his PCP for thyroid testing in January 2020 is not remarkable, since it occurred only one month after he began treatment with the sports medicine physician pursuant to the PCP's referral. In *Kirby*, the Federal Circuit explained that its holding in *Cucuras* was limited to "the unremarkable proposition that it is not erroneous to give greater weight to contemporaneous medical records than to later, contradictory testimony," but that this principle should not be interpreted as a finding that "the medical records are presumptively accurate and complete, . . . that when a person is ill, he reports all of his problems to his doctor, who then faithfully records everything he is told." *Kirby,* 997 F.3d at 1382-83. In that case, the Circuit determined that the special master's finding of six-month sequela was not arbitrary or capricious, despite the lack of recorded symptoms and the *Kirby* petitioner's general statements of feeling fine or having no complaint. *Id.* at 1383.

Petitioner's overall limited medical care course suggests a lower pain and suffering award will be proper in calculating damages. But it does *not* mean I cannot find the basic requirement of six months severity met. Nor does the intermittent nature of Petitioner's symptoms prevent him from establishing sequela for more than six months. Accordingly, there is preponderant evidence to establish Petitioner suffered the residual effects of his alleged SIRVA for more than six months.

---

[10] The WHO declared COVID-19 a Public Health Emergency of International Concern on January 30, 2020, and a pandemic on March 11, 2020. *See* https://www.who.int/europe/emergencies/situations/covid-19 (last visited on June 25, 2024).

### III.   Additional Requirements for Entitlement

#### A.   Legal Standards

In addition to requirements concerning the vaccination received, the duration of petitioner's injury (discussed above in Section II), and the lack of other award or settlement,[11] a petitioner must establish that she suffered an injury meeting the Table criteria, in which case causation is presumed, or an injury shown to be caused-in-fact by the vaccination she received. Section 11(c)(1)(C).

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of a Hep B vaccine. 42 C.F. R. § 100.3(a)(VIII)(B). The criteria establishing a SIRVA under the accompanying Qualifications and Aids to Interpretation ("QAI") are as follows:

> Shoulder injury related to vaccine administration (SIRVA). SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction. SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.). SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis (even if the condition causing the neurological abnormality is not known). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:
>
> (i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged

---

[11] In summary, a petitioner must establish that he received a vaccine covered by the Program, administered either in the United States and its territories or in another geographical area but qualifying for a limited exception; suffered the residual effects of his injury for more than six months, died from his injury, or underwent a surgical intervention during an inpatient hospitalization; and has not filed a civil suit or collected an award or settlement for her injury. *See* Section 11(c)(1)(A)(B)(D)(E).

signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;

(ii) Pain occurs within the specified time frame;

(iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and

(iv) No other condition or abnormality is present that would explain the patient's symptoms (e.g. NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10) (2017).

### B.     Analysis

Respondent has stated no further objections to compensation, and I find Petitioner has otherwise satisfied all criteria for a Table SIRVA injury following receipt of the flu vaccine. There is no evidence of prior left shoulder pain, inflammation, or dysfunction or an alternative cause for Petitioner's symptoms. *See* 42 C.F.R. § 100.3(c)(10)(i), (iv) (first and fourth QAI criteria). And Petitioner experienced pain within 48 hours of vaccination and exhibited pain and limitations in ROM solely in his left, injured shoulder. *E.g.,* Exhibit 8 at 14 (first report of pain in late November 2019); Exhibit 4 at 4 at 13 (reporting immediate pain and exhibiting limited ROM in the left shoulder at the first visit with the sports medicine physician); *see* 42 C.F.R. § 100.3(c)(10)(ii) & (iii) (second and third QAI criteria).

As I have determined in this ruling, the record supports a finding that Petitioner suffered the residual effects of his SIRVA for more than six months. *See* Section 11(c)(1)(D)(i) (the Vaccine Act's six-month severity requirement). Additionally, the vaccine record shows Petitioner received the flu vaccine administered at a Walgreens pharmacy in Houston, Texas. Exhibit 1 at 5; *see* Section 11(c)(1)(A) (requiring receipt of a covered vaccine); Section 11(c)(1)(B)(i) (requiring administration within the United States or its territories). And there is no evidence that Petitioner has collected a civil award for his injury. *See* Section 11(c)(1)(E) (lack of prior civil award). Thus, Petitioner has satisfied all requirements for entitlement under the Vaccine Act.

### IV. Appropriate Amount of Compensation

Although I have found Petitioner entitled to compensation, I do not expect the amount awarded for Petitioner's past pain and suffering to be great. Throughout his injury, Petitioner experienced lower levels of pain and only mild to moderate limitations in ROM. And he required only conservative treatment (a HEP, PT, and two cortisone injections), and no surgery either. Petitioner should not expect a substantial pain and suffering award, given the overall preponderance of evidence on his level of treatment and associated issues.

### Conclusion

**Based on the entire record in this case, I find that Petitioner has provided preponderant evidence satisfying all requirements for a Table SIRVA and the Vaccine Act's severity requirement needed for both Table and non-Table claims. Petitioner is entitled to compensation in this case.**

**IT IS SO ORDERED.**

<u>s/Brian H. Corcoran</u>
Brian H. Corcoran
Chief Special Master